Thank you, Your Honor. May it please the Court. I'm Joseph Daly for the Plaintiff Appellant. I'm going to try to reserve four minutes for my rebuttal. Given this appeal's myriad issues, I'd like to focus the Court's de novo review onto three areas. First, defendants' misstatements and omissions concerning Uber's regulatory compliance efforts. Second, defendants' misstatements and omissions concerning the two major data security breaches. And third, the sufficiency of the complaints allegations concerning class members' losses that we linked to the defendants' actions. Now, turning to the regulatory misstatements that were defendants uttered both publicly and in the offering memorandum. On July 12, 2014, Uber issued a statement claiming, quote, we've been working in good faith with regulators to modernize laws and find a permanent home for Uber in cities, end quote. That seems true, counsel. Pardon me, Your Honor? That seems true, accurate. What's false about that statement? No, it's both false and misleading, Your Honor. To say that they are working in good faith with regulators while at the same time undertaking the secretive, very likely illegal gray ball operation in major cities around the world, such as Boston, Portland, Las Vegas, and Paris, you can't reconcile. But weren't they also working with them to try and, I mean, to try and become operable in all of these areas, countries and states and localities? Two responses. Number one, yes, they were working with them legitimately, which is true. But number two, even literally true statements can be misleading under the securities laws. And this is a perfect example of one right here, because they're coming into these offerings. They're going to be asking investors to part with $10.6 billion of money in these private offerings. The investors and the market know that it's misleading whether it's $5 or $10 billion. I mean, your arguments are the same and the amount of money isn't. Well, it would have to be materially misleading. And we believe to state that you are working in good faith with regulators. For Kalanick to tell the BBC, we work with regulators and cities to make things work. And in the offering memorandum in early 2016, under legal and regulatory risks, to note that there are laws and regulations that could expose Uber to liability and could dampen our growth and profits. In the same breath to claim that Uber is, quote, actively challenging, end quote, local laws. I would submit to you that investors would think that actively challenging and working in good faith connotes above board legal efforts to actually work with regulators instead of putting fake apps on their phones so those very same regulators can't see what Uber is doing. And whether or not the investors in the offerings believe that those statements were in the litigation for that question to be answered as a matter of law at the 12B6 date. Now, the district court excused those statements as aspirational. And it noted that the defendants didn't claim gray ball was legal. Well, your honors, it's not aspirational when the defendants are responding to the market and to market analysts who are specifically questioning the regulatory hurdles that Uber is facing coming into these multi-billion dollar offerings. The defendants didn't claim that the defendants didn't claim gray ball was legal is irrelevant. They didn't even disclose its existence, your honors. And as I mentioned earlier, the conduct doesn't have to be illegal to be actionable. The securities case law books are full in which would kick. Can I ask what it would your response? You're relying specifically on you. Your claim wouldn't be the same, right? I mean, you're not suggesting they had affirmative duty to disclose gray ball or maybe you are, but your argument seems to be stronger slightly because they made an affirmative statement. They disclosed some facts. I mean, they also said, you know, we have a problem in some areas. I mean, part of this issue seems to be would the investors have known that Uber was not permissible in certain localities? And I guess that's where I'm struggling because Uber made that disclosure that, you know, they made a whole lot of caveats to the regulatory scheme and they were working in good faith in many of those to try and get it. Your point is once you make those positive disclaimers and assert assertions, you can't also ignore the negative implications that you're doing. Yes. Judge Nelson. And it's not only my assertion, it is this circuit's assertion. If your honors would look at the circuit's case, Burson five 27 F third at nine 87. It's a basic tenant of securities law that having addressed a certain subject, the defendants then have the duty to be truthful about that subject. They could have kept silent. All right. They could have kept silence about gray ball. They could have kept silent about the second category of misstatements. I mentioned the data security breaches, but instead they chose to address those subjects. And when they chose to address those subjects, they did owe an affirmative duty to the investors in those four offerings to come clean about it. Now, for example, turning to those data security breaches now responding to the consumer's concerns in around 2000 and in late 2014. Can I just ask a question about the data breaches? Because it seems to me one of the main problems you have, and I don't know how big of a problem, but as I dug through it, it seems like you're relying primarily upon an unnamed source who made an alert, you know, a purported misrepresentation that was reported to the press. Am I accurate in that? Or is there more to it that goes to the misstatements in the data breach? Mostly accurate judge Nelson. Let's not forget. We're alleging both omissions and misstatements. You put your finger on an affirmative misstatement that appeared in the wall street journal, where an Uber spokesperson said to the wall street journal, quote, Uber has adopted all the privacy measures requested, end quote, by the New York Attorney General. Now that's, that's a pretty strong, definitive, verifiable statement. Previous to that, there were some omissions when they talked about how Uber's privacy experts had performed a comprehensive review in January of 15 and said, quote, overall, our privacy program is strong, end quote. They omitted the 2014 breach that they had just discovered in September. All right. Well, but, but I, so to me, I don't know that that's as much of a problem. I, my, my question was an unnamed source. What's the best case you have that an unnamed source in a news article can satisfy the particularity requirement under rule nine B for pleading in misrepresentation? Well, you're on rule nine B in talking about mistake or fraud, you need to identify the statement, uh, uh, who made it, where it was made, who made it. And the article who made the statement, an Uber spokesperson, is that enough at the pleading stage? It has to be your honor. And I don't know that it has to be. And I'm asking you for your best case that big, because this is very important for the rule nine B standard. You usually have to have who made it. And it's not just the type of person that made it, but who made the misrepresentation. When was it made? You know, your honor, I read the Wall Street Journal every day and every day on the second page, there's a corrections and modifications box in the lower left column. Uber didn't come back the next day. What are you doing saying that we've, we've satisfied the New York attorney generals? Well, now, now you, now you're placing an incredible burden that I don't think I would be very hesitant to place on companies to go out and, and correct every misstatement that's made about the company by the press. That would, I mean, we'd hardly get any business done in this country if that was the legal requirement. Counsel, I'd like to interject a question for you. I think that the distinction that was raised in the questioning by Judge Nelson at the outset is a significant issue to consider. That is the distinction between whether you're contending that a, that affirmative misrepresentations were made as contrasted with contending that there were material omissions. At least for me, that's important. So I guess I'd like to know what's your strongest example or examples of actual affirmative misstatements or misrepresentations that were made? Because I think those probably need to be tested under the lens of FRCP 9B. All right. And are we still referring to the data security breaches, Judge Gould? I'm asking you for any, or any contentions, those or others? All right. Well, so far as the data security breaches, as I said, the 2016 series G memo, it expressly referenced the 2014 breach and it claimed, quote, Uber may be unable to anticipate, end quote, hacking or, quote, implement adequate protective measures, end quote, and thus it could experience negative press and legislative and regulatory action as a result. They affirmatively referenced the breach that investors had just discovered, knowing at the same time that they had not fixed the multi-factor authentication problem that led to that breach, that a year later would lead to the breach of 57 million riders and drivers. So is that an omission or is that an affirmative mistake? I believe it's a combination of both, Your Honor. And of course, an omission makes a spoken or an uttered statement misleading by omitting some material facts and harkening back to what I said earlier, what Judge Nelson and I were discussing about Fiverr, the fact that Uber chose to address that subject, the data breach, put into play the truth surrounding that data breach and they omitted the remainder of the information about that. And as we know, when that second data breach happened, they kept quiet for another year. They paid $100,000 ransom to the hackers to keep quiet about it. And that second breach led to $148 million penalties around the country and all 50 state attorney generals charging them. And Uber had said in its offering memorandum that our brand identity is critical. It is critical to this company's future. And anything that could affect that brand identity could be detrimental to that future. Knowing that, they chose to speak about these subjects that were near and dear to investors' hearts and yet did not tell the full truth. I see I'm getting down to about three minutes, so I'd like to reserve the remainder of my time for this. That's fine. And for you initially, counsel, I think you initially wanted five minutes? Four minutes, Your Honor. Four minutes. Okay, so we'll give you another minute and 12 seconds. So you'll get your four minutes of rebuttal. I appreciate that. Good afternoon. So could the clerk make the clock four minutes of rebuttal for Mr. Daley? And then Mr. Ashley is going to go next? Yes, Your Honor. Good afternoon. It may have pleased the court. I see the clock is already set at nine minutes. We have split nine minutes and six minutes, Uber and Mr. Kalanick. This court should affirm the district court because the district court faithfully and correctly applied this court's established precedent in dismissing the second amendment complaint. And I'm going to address some of the issues that were just raised by this panel and some of the responses that you got. Counsel went directly to regulatory compliance and discussed the working in good faith with regulators to modernize laws statement. And I think you correctly pointed out that that is true. There is nothing about that that is false, but there's also nothing about that that is misleading. This court in retail wholesale. What about the idea though, that after they'd said we're working in good faith and they were, one aspect they were working in good faith, but what about the gray ball? I mean, is your position that gray ball is, was that good faith? I believe it was, but I think the first question that you believe gray, you believe gray ball was good faith. Yes. Allocations about gray ball were made. That was good faith working with investors or with regulators. I don't think it's the question, but I do believe it's good faith for the exact reason that your honor mentioned, which is there was a debate, a public debate going on at the time about whether or not there were modern rules and regulations, um, with respect to Uber and several of these regulatory agencies were captured by taxis. So I do believe that you could actually reconcile gray ball with the term good faith, but I don't think that's the key question for the court today. I think in, um, retail wholesale, the court noted that the first question you asked with a statement, like we work in good faith with regulators to make things work is will investors rely on a statement like that to make an investment decision. In other words, is it objectively verifiable? Is it too general? And is it too vague that investors would ever rely on it? And if they don't, then it's not misleading as a matter of law, whether you call that seems to be your strongest argument. I'm still stuck on the fact that you're defending gray ball as working with regulators in good faith. I mean, and I don't want to focus too much on it given the time you have, but, but I mean, to black ball effectively or gray ball, I guess is the right term and prohibit regulators from accessing Uber doesn't seem to be good faith. Well, I don't want to get hung up on it. So I'm going to assume let me ask you about the dummy accounts because I actually had some concern about the dummy. There was Uber book and cancel lift rides. I don't know whether they were, they weren't, but the allegations are that they were using dummy accounts. Why isn't that enough to show a misrepresentation? Well, I don't believe there's an actual allegation that Uber was, there's, there's a conflation that occurs sometimes. Don't they argue, don't they state that Uber had paid people to book rides with lift drivers using dummy accounts to try to recruit them to Uber and had employees book and counsel more than 5,000 rides. No, they don't plead. They never plead that occurred. Okay. Not that, but that's, they were conflating that with gray ball. They claim that gray ball occurred. There is no allegation in a second amendment complaint or any of its predecessors that Uber in fact created W dummy accounts and then canceled rides with lift. It's a totally different issue. They never claimed that occurred. Okay. Now I do want to get back to the, to the, to the regulations and you're on, I don't want to get hung up on whether or not it was good faith because I do think that it's puffery. And I do think they're missing the tethering that this court generally requires. Whenever you you've asked probing questions on whether or not this case is really about misstatements or omissions. And even when a case is based on omissions, they have to be tethered to the statements actually made. You know, this court held that in Brody and it held that in in Ray Riggle. So for instance, in, in Ray Riggle a pharmaceutical company released information about a clinical trial speaking about some side effects, but not about others. And this court held that it wasn't a securities fraud omission to not speak about the side effects that the company didn't discuss because companies can control what they have to disclose by controlling what they discuss. And I just don't think we work with regulators or phrases like that, that you see throughout the complaint imply anything about the statement, I mean the alleged fraudulent activity. This is clearly a situation in which the plaintiffs have looked for fraudulent activity and then searched for a statement to try to match it. And it's not supposed to work that way. And your honor, you noted something about the, the risk disclosures. Now we believe they're not even Uber statements, but I do find it odd. Well, you believe they're not because it was, it was a separate, I forget the name, I apologize. New Riders Memo by Morgan Stanley. Nobody contends Uber controls Morgan Stanley, but I'm not going to get into Janus. We briefed it and I heard what you said in one of the prior arguments. I don't think we need it in this decision, but I do want to point out if you go to supplemental excerpts of record 609 to 610, this is exerting this, this, this offering memorandum that constantly gets quoted a few words at a time. Here's what the offering memorandum said that they claim was misleading. Quote, in certain jurisdictions, the company has continued to offer its services despite laws or regulations that could be interpreted to block those services. The company's continuation of this practice may result in fines or other penalties from local regulators, as well as negative press coverage, which may discourage drivers and riders from using the services and could adversely impact the company's profitability. I don't believe they'd even allege that's misleading by omission. It doesn't discuss anything about gray ball or imply anything about it. Now, the other area that they, that they raised was the data security. Let's remember something that this plaintiff invested after the 2014 data breach and non-disclosure of it. Now they're saying that because that was perpetrated by multi-factor authentication or the lack thereof, that somehow that security's fraud. But the only statement that they allege is from a Wall Street, not even the Wall Street Journal, a Wall Street Journal blog. And you asked for the best authority in support of being able to allege an anonymous statement. Here, not only do we not have an anonymous statement, I mean, no quote. So it's an attribution to an unnamed person that's being paraphrased. And we cited this circuit's decision in Kearns v. Ford, which didn't deal with anonymous sources, but dealt with a plaintiff in an unfair competition law action. They couldn't name the company representative that allegedly lied to them. And the court said that doesn't satisfy 9b. We then cited in Ray Time Warner from the second circuit, which was on point on this issue and explains why you don't allow anonymous sources to satisfy 9b. Their only retort to that was we should have policed it. And we cited Rob versus General Physics out of the fourth circuit saying you don't have a duty to police. They don't. Wait, let me ask you that. Does the ninth circuit have case? Because to me, that seems like a pretty fundamental legal issue that needs to be clarified. Does the ninth circuit have any case law similar to that in the fourth circuit on that there's no need to police? This was the best we could find. We don't believe there was one of the ninth circuit, but we do think that it's practical and it makes sense. And it's probably a continuation and extension of the Kearns case, which again, didn't use the term anonymous, but said for 9b, you have to at least identify the speaker. That's the bare minimum. I also want to note just in closing, I think I'm going beyond my time, but counsel referenced the Burson case. And actually I think the court should read the Burson case. In Burson, that was the case where there were financial statements that expressly touted their backlog orders, tens of millions of dollars in backlog orders. But they left out that those very backlog orders included government stock work orders that can never be received. And that was what was alleged to be an omission, or what was determined by the ninth circuit to be an omission that was adequately tethered to the misstatement. And that's what's missing here. And it's missing pretty much throughout the board. I'm not going to go into each one of the statements, but in conclusion, I'll say the second amendment complaint, like both of its predecessors, is long on alleged corporate misconduct, but it doesn't connect that misconduct to actual statements. Plaintiffs are struggling to create that connection still, but it's not there. The district court was correct and it should be affirmed. Thank you, counsel. I think we will turn to Ms. Harris. Thank you. May it please the court. Sarah Harris for appellee, Travis Kellin. In addition to the points my co-counsel raised, I will discuss two reasons why this court should affirm the dismissal of plaintiff's suit against Mr. Kellin. First, none of the alleged Kellin statements are actionable. Plaintiff has waived all but seven. And if those statements are actionable, every general statement of corporate optimism could be securities fraud. And second, plaintiff hasn't alleged any basis for holding Mr. Kellin liable under California law because he wasn't a direct market participant who could directly effectuate the sale of shares, which is what California law requires. Now, let me start with the actionable statements. There are two fatal problems with plaintiff's position. First is the pleading problem. As Judge Nelson has noted, rule nine really requires pleading the who, what, where, when, and why of a securities fraud claim with particularity, but plaintiff has not connected the dots by identifying what is false or misleading about each statement, which is what rule nine requires. And second, plaintiff isn't claiming that any of the non-waived seven Kellin statements are even false. And they certainly aren't misleading as a matter of law. Reasonable investors would discount these types of general expressions of optimism from CEOs. Now, the only statement I heard my friend, Mr. Daley mentioned in his argument from Mr. Kellin is this statement, quote, we work with regulators to make things work, end quote. And there are a number of problems with holding that statement to be actionable securities fraud. It feels as a matter of law. If you're going to delve in, rather than retread new ground, I wanted to, since you're the only one with the pulpit, I wanted to turn you to paragraph 75 of the second amendment, amended complaint, because I think that does hit on these 5,000 rides on Lyft that were not, or that were booked surreptitiously, if you will, using dump trucks. And so I'm a little confused by your co-counselor, and I guess not co-counsel, but my Mr. Ashley's statement that that wasn't alleged in the complaint. So help me out here. If am I misreading paragraph 75 of the second amendment amended complaint about the fact that dummy accounts, they used dummy accounts to book 5,000 rides. It seems to be in there. So you're looking at excerpts of record page 90? Yes, that's correct. Okay. So that paragraph says, does allege Uber paid people who to book rides with Lyft drivers using dummy accounts and also had employees book and cancel more than 5,000 rides. I think there's a couple of problems because if you look at Plinkett's briefing, what they actually say about the competition with Lyft. So you're agreeing that it's in the complaint, correct? I'm agreeing that what I read was an allegation about reports. Okay. So then go on to your, so that's okay. I just want to make sure we're all on the same. I'm going to interject here that to take a little pressure off this Harris to defend. Yeah, I agree. I'm going to give Mr. Ashley an extra minute so he can respond directly. That's good. So then go on to your, I appreciate that judge Gould, Ms. Harris, if you can address the second part of that, because I think where you're going, and this is a question I would have is that wasn't really raised in the briefing before us. Is that correct? Correct. And I do of course, defer to Mr. Ashley with respect to Uber statements and appreciate judge Gould for giving him the time, but it's correct. The way that Plinkett has framed the issues with Lyft in the briefing. And again, this is sort of a perennial issue with respect to what was raised and what was waived. The allegation with respect to Lyft is that there was some sort of monitoring of Uber and Lyft drivers and sort of an unfair competition type thing. And, and again, the only allegation remotely on point with respect to Mr. Kalanick on competition are such anodyne statements as quote, we pride ourselves on being fierce and principled competitors. And if that is securities fraud, then every company in America with an enthusiastic CEO would be committing securities fraud. This is the kind of white is that investors do not regard as something that they weigh. And it's a matter of law. And I think you see cases like retail wholesale and city of Pontiac. Can I ask just briefly, I'm sorry, was there another question? Can I ask briefly about the loss causation? Because that seems to be a pretty big part of how these statements, assuming they were misstatements or omissions, how it affected the loss. And is that, do you agree with that position or what's required, what's missing from the plaintiff's theory here? Sure. So with respect to last causation, I do defer to my colleague, Mr. Ashley, with respect to Uber's arguments as Mr. Kalanick doing them. But we agree, obviously, that last causation is missing under the relevant standards here, which is 990. And I think Mr. Ashley, fair enough. He's got one minute. He might have a lot in his plate. But I do think this also illustrates the number of flaws with respect to plaintiff's position. There are a number of different independent ways in which the district court's opinion should be affirmed, both with respect to Mr. Kalanick and with respect to Uber. And so if the court doesn't have any questions with respect to the direct market participant issue, which is unique to Mr. Kalanick, that, again, is another independent basis on which Mr. Kalanick really cannot be held viable. California law is quite clear. And I don't think plaintiff particularly disagrees with the clarity of the requirement that you can't just sort of be someone's company. You actually have to be someone in a position who can actually have shares. So if there are no further questions, we ask that you are firm. Thank you. Now, Mr. Ashley, I'm going to go out on a limb here and say you've got two minutes. OK, Judge Nelson, I did not mean to imply that that statement wasn't in the second amendment complaint. It is what we showed was it's irrelevant to any of their statement of issues referenced at appellant's opening brief page. Oh, so your position is that Uber never denied that it was using dummy accounts to book and cancel Lyft rides? No, Uber did deny it. So that's what I'm getting to. The appellant's opening brief says one of the statements at issue is, quote, a late August 2014 reassurance by Uber that its marketing tactics were above board and transparent in response to charges of using dummy accounts to book and cancel Lyft rides. That's the appellant's opening brief. They cited this very paragraph. Now, the second amendment complaint never enlists all of the alleged falsity in Uber statements. And it gives gray ball, hell, alleged theft of trade secrets. Nowhere does the complaint say that this statement was false because Uber was, in fact, doing that. What they're setting up in that part of their second amendment complaint is that Uber denied it. And what we tried to point out was that and they haven't contended that it's not the case because all they've alleged that was false or that was misleading was that it was gray ball or hell or one of the other items identified in their complaint. They can't point you to anywhere where their complaint says that this statement where Uber denied that it was doing this was false, much less it was ever admitted by Uber that it did it. So 28 seconds left. Do you want to get lost causation? Yeah, you know, we I think briefing speaks for itself largely, but I just want to say this circuit has held rule 90 applies to loss causation. What they did was group 100 plus statements together in one pile and then claim, hey, there was inflation over several years, so they caused it. And then later there was deflation over a year and a half. And that means a statement. The statements must have caused it. It's too gloppy to satisfy rule nine. And I will also note it shouldn't go without saying that even though their statements have changed from the complaint to the first amendment complaint, the second amendment complaint to then disclaiming certain statements in their appellate brief. Causation always stays the same. Inflation is identical and deflation is identical. It doesn't satisfy rule 90. Thank you, Mr. Ashley. Now we're going to return to Mr. Daly for his rebuttal argument. I think we said it would be four minutes. Is that for you, Mr. Daly? I think loss causation, but I first want to make one preliminary observation. Council said that corporate optimism is not actionable. That's precisely 180 degrees away from what this court says in the quality systems appeal, which I argued and briefed. Quality systems, 865 F third at 1143. Even general statements of optimism may be actionable given their context. And what was context here, your honors? The market was directly questioning Uber's control over the private data it had collected. Uber expressly warned our clients of the risk of negative publicity from data breaches. So it knew that investors were paying attention to that. And it was asking those same investors to inject 10.6 billion into the company. That was the context for that so-called corporate optimism. Now, loss causation. I understand council wants to talk about 9B, but let's talk about the California statute, 25400. That statute requires, and that's the statute we're proceeding under in federal court under the class action. I'm sorry. We're in here under diversity. That statute requires only that the securities price was affected by defendant's actions. That's all we had to plead. And we certainly- I thought California had said they look to the federal rules and specifically to 9B in applying its law. Well, and then if you fit those allegations of how we met the California statute into 9B and the Apollo case, then we've done it. We've shown, we've pleaded what using the cash discount flow model, we've pleaded what price was paid in the offerings, that that price was 30% inflated, that investors would have discounted that price had they known of the- Well, but council, let me, let's go to that. Let's go to the, I apologize. I got to find it. Your graph. Was that a graph you created or was that a graph? I mean, did you, where did that graph come from? Is that something that you put together or does this exist in some publicly available source? This is it. It's paragraph 198 of the complaint. Yeah. And it looks as though it comes from various SEC filings. So I don't know the answer to that. Well, but yeah, that's, that's my question is that I don't think this graph was in the SEC filings. I think that this data from the SEC filings that was compiled into a graph, but, but if you look at it, you have more than half of these where there's no effect at all. Well, one of them, there there's a positive impact. There's no, there's no effect at all immediately. And that's true. Two points in response. Number one, as we pointed out to the district court, which did not sway the district court, private shares, such as the ones that were offered in, in these offerings do not respond to external market forces the way publicly traded ones do. And that's this court's decision in the Nuveen case. Well, but, but, but I mean, how far does that go? So your point is the four that decreased after, I mean, one had started to decrease before four of them start to decrease at various points after wouldn't, wouldn't they have started to decrease all the same time if they were responding to the same, you know, the, the, the, the same misstatement, if you will. Two quick responses, Judge Nelson. Number one, you are asking for what defendants had asked for the immediate reaction to news coming out in the public. And this court in the America West decision says we do not need an immediate reaction. We don't know how often, whether it's quarterly once a year. No, no, no. That's not my question. My question is not the immediacy of it, but the consistency of it among the four different funds. Well, I would say consistently over the year, they all reduced their valuation from 28% to 33% of Uber. And let's not forget in November of that the Japanese conglomerate made a tender offer for Uber shares reflecting a 30% drop in value from the year before and who sold one defendant Kalanick. So he dropped. Okay. Thank you, your honors. Thank you. Counsel, unless judge Kelly or judge Nelson have further questions, but I have none. I'm going to thank appellant's counsel, Mr. Daly and the appellate's counsel, Mr. Ashley and Ms. Harris for their excellent arguments. It's an important case, a difficult case, and the panel will now take it under submission and the parties will hear from us in due course. So thank you again.
judges: Kelly, Gould, Nelson